IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KIMBERLY MARNELL WRIGHT      :      CIVIL ACTION
                :
       v.          :
                :
CITY OF PHILADELPHIA, et al.     :      NO.  01-6160

## MEMORANDUM AND ORDER

M. FAITH ANGELL                 November 17, 2005
UNITED STATES MAGISTRATE JUDGE

    On January 2, 2003, the Honorable Norma L. Shapiro ordered that the above-captioned case be referred to me for all further proceedings and the entry of judgment. *See* Docket Entry No. 64.  On March 13, 2003, I granted Defendants' Motion to Stay Trial pending Defendant Police Officers O'Malley and Heeney's appeal to the Third Circuit Court of Appeals.  *See* Docket Entry 73.  On June 6, 2005, the Third Circuit held Police Officers O'Malley and Heeney are entitled to qualified immunity.

    Presently before this Court is Defendant City of Philadelphia's renewed Motion for Summary Judgment.  In its motion and accompanying Memorandum on municipal liability, the City argues, first, that Plaintiff opted to forego her claim for violation of her Fourteenth Amendment right to Equal Protection and, second, that Plaintiff is unable to prove such violation.  The City has also argued that the opinion of the Third Circuit compels this Court to dismiss Plaintiff's case.

    For the reasons which follow, I find that the Third Circuit's opinion does not affect Plaintiff's claim that her Fourteenth Amendment right to Equal Protection has been violated, and that Plaintiff has met her burden of proof to survive summary judgment on the Equal Protection claim.  Accordingly, Defendant City's renewed motion for summary judgment on the Equal Protection claim is denied.

1

## I. <u>FACTUAL BACKGROUND.</u>

The facts remain unchanged since the original February 3, 2003 Order by this Court denying both Plaintiff's and Defendants' motions for summary judgment.  As discussed below, the Court of Appeals did not rule on the sufficiency of the facts alleged.  Further, Plaintiff has not removed any evidence from consideration since that Order.  As such, the factual statement in the March 19, 2003 Supplemental Memorandum supporting the February 3, 2003 Order is adapted and reproduced here.[1]

In the early morning hours of December 16, 1999, Plaintiff Kimberly Wright was driving alone on Chelten Avenue when her car broke down.  Two men, one of whom identified himself as Ronald Jackson, stopped to help Ms. Wright.  *See* Volume I of Plaintiff's Exhibits in Support Plaintiff's Motion For Summary Judgment On Liability [Docket Entry No. 28][2], Exhibit "A-4"(Affidavit of Probable Cause For Arrest Warrant).

As Plaintiff stood next to the men, she felt a needle prick in her left arm and she lost consciousness.  The next thing she remembered was being in a hair salon, near Ogontz Avenue.  Plaintiff described the salon as green and white, with scissors in the window and blue neon lights, brightly lit inside.  While she was in the salon, Plaintiff could see, but she couldn't move.  Someone tried to pour something down her throat, and Plaintiff again lost consciousness.  When she awoke, she was on a bed in a house.  The two men were standing near the bed, getting dressed.  Plaintiff noticed that her pants were on, but her stockings were off, and her blouse was open.  Plaintiff had no recollection of having sexual intercourse with anyone, while at the salon or the house.  However, when she woke up on the bed, Plaintiff had a discharge from her vagina, and "smelled like sex."  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A-3" and "B-8", and Defendants' Exhibits in Support of

---

[1]        As in that Supplemental Memorandum, the facts are presented here drawing all reasonable inferences in favor of Plaintiff, the non-moving party.  *See, e.g.,* <u>Hamilton v. Leavy, et al.,</u> No. 01-3062, 2003 WL 559392 at *4 n.4 (3d Cir. February 28, 2003).

[2]        Hereinafter, Plaintiff's MSJ Exhibits, Volume I/Volume II.

Defendants' Motion For Summary Judgment And Reply to Plaintiff's Motion for Summary Judgment [Docket Entry No. 43][3], Exhibits "B" and "C."

The two men told Plaintiff that they would take her back to her car, but they left her on a porch step outside. The men got into a sky-blue car with Virginia plates, and drove away. Plaintiff banged on some of the neighboring doors, but got no answer. She went back to the house, and broke a window with her hand to get back inside to get some more clothes. *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "A-3."

In addition to getting her clothes, Plaintiff took some items from the house to prove that she had been inside, and to help identify her attackers. Items taken included: bags containing clothing, unopened bottles of alcohol, a telephone, several pieces of mail, and some photographs; and two cancelled checks made out to "Ron Jackson." Plaintiff then left the house and began walking down the street. An older man gave her a ride to an area where she was able to get a cab. The cab took Plaintiff to her friend Bernice Jones' house. *See* Defendants' MSJ Exhibits, Exhibits "C" and "G." *See also* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A-6" and "B-15."

When Plaintiff arrived at Ms. Jones' house, at approximately 2:30 p.m. on December 16, 1999, she was hysterical, and bleeding from the side of her mouth and her wrist. Plaintiff told Ms. Jones that she had been drugged and attacked by people who had stopped to help her when her car broke down. Plaintiff said that her attackers had "done everything" to her, and that she smelled funny. Ms. Jones helped Plaintiff wash herself, gave her some clean clothes and sent her to bed. While Plaintiff was sleeping, Ms. Jones washed her clothes. When Plaintiff woke up in the early evening, Ms. Jones fed her and sent her back to bed. On the morning of December 17, 1999, Plaintiff's sister took her to the hospital. *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "A-6."

---

[3]   Hereinafter, Defendants' MSJ Exhibits.

At the hospital, Plaintiff reported the sexual assault. Hospital records indicate that there was a white discharge from Plaintiff's vagina, and that Plaintiff complained of elbow pain from being dragged by her attackers. Injuries to Plaintiff's arm and elbow were noted, however, no puncture wound was noted. A Johnson's Rape Kit was prepared, and blood specimens were taken from Plaintiff. *Id.*

Detective Manning took a statement from Plaintiff at the hospital. Plaintiff gave the details of the attack, explaining that she believed she had been drugged into unconsciousness, transported to a hair salon and a residence near Ogontz Avenue, and sexually attacked by two men, whom she identified as Ron Jackson, and someone who may go by the name "Dre." Plaintiff told Detective Manning that she had broken a window to get back inside the residence to get her clothes, and that she thought the address of the residence was 7054 Cedar Park Avenue. *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "A-6."

On the afternoon of December 16, 1999, Denise Pue, owner of the residence at 7024 Cedar Park Avenue, reported that her house has been burglarized, sometime between 6:50 a.m. and 1:45 p.m., while she was at work. Ms. Pue claimed that items taken included: two 13" televisions, one SONY VCR, and approximately $2,000.00 in cash. Ms. Pue told Officer Shade, who took the initial report, that she has found a cell phone, which did not belong to her or anyone in her house, next to her front door. *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "F."

Defendant Detective Daniel Heeney of the Northwest Detectives was assigned to investigate the burglary. In the evening of December 16, 1999, Detective Heeney and Detective Michael Dais went to 7024 Cedar Avenue to process the scene. No one was home at the time, but the front door was open. There was a broken pane of glass by the front door. The Detectives checked the residence, took photographs, checked for latent prints, and spoke to a next door neighbor. Detective Heeney recovered a piece of paper from the residence with the name "Kimberly Wright" on it. *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "A" (Deposition of Heeney) at pp. 22-30.

4

Later in the evening of December 16, 1999, Detective Heeney interviewed Denise Pue at the station.  Ms. Pue did not see anyone commit the crime, but told Detective Heeney that she learned from a neighbor that her brother, Ronald Jackson, had brought a woman to Pue's house after she left in the early morning of December 16th.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A" (Deposition of Heeney) at p. 34, and "B-14" (Internal Affairs Division Investigation Report) at page Bates Stamped "000007."

On December 17, 1999, Detective Heeney interviewed Ronald Jackson.  Mr. Jackson acknowledged that he and his friend, Lamar, had stopped to help a woman whose car was broken down at approximately 4:30 a.m. on December 16, 1999.  They took her first to Mr. Jackson's hair salon, Emerald City, to look for jumper cables.  After staying at the salon for approximately an hour, talking and unsuccessfully looking for jumper cables, Jackson and Lamar took the woman to his sister-in-law (Denise Pue)'s house.  According to Jackson, they were at the house about twenty minutes before he told the woman it was time to go.  The woman, who was "extremely intoxicated," refused to leave.  Jackson and Lamar got her outside, and she again refused to leave.  Jackson and Lamar got into his car and pulled off, calling the police to get the woman to leave the property.  Jackson says that after he saw the police stop and talk to her, he and Lamar left and went back to Emerald City.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A-3" and "A-4."  Ronald Jackson denied having sexual intercourse with the woman.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "A" (Deposition of Heeney) at pp. 81-82.

Detective Heeney confirmed that there was a 911 call made on December 16, 1999 at 12:18 p.m. of a person with a weapon outside of "7024 Cedar Brook [*sic*] Avenue."  Two officers responded and reported "nothing showing upon police arrival."  Detective Heeney did not make any effort to get a tape recording of this call.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "A" (Deposition of Detective Heeney) at pp. 38-39, and Defendants' MSJ Exhibits, Exhibit "F."

Detective Heeney ran a records check on Ronald Jackson because he was a witness in the burglary investigation, and because Detective Heeney had "some suspicions," and wanted to "know who he was and what kind of background he had." *See* Plaintiff's MSJ Exhibit "A" (Deposition of Detective Heeney) at pp. 41-42. The records check revealed that Ronald Jackson had many prior arrests and convictions, including robbery, drug dealing, and gun violations. *Id.* at pp. 44-46. *See also* Plaintiff's MSJ Exhibits, Volume I, Exhibit "A-1."

On December 17, 1999, Defendant Officer Denise O'Malley interviewed Plaintiff about her sexual assault complaint. Consistent with her initial statement to Detective Manning at the hospital, Plaintiff reported that two men had stopped to help her on the morning of December 16th when her car had broken down. The men had drugged her and poured something down her throat, and taken her to a hair salon and then a residence. Plaintiff told Officer O'Malley that she believed that she had been dragged because her arms were sore and her shoes were scuffed. While Plaintiff drifted in and out of consciousness and did not remember having sexual relations with anyone, she did remember waking up on a bed with her pants undone, her stockings off, and her blouse undone. The men were in the room with Plaintiff, and were putting their clothes back on. Plaintiff told Officer O'Malley that the men had put her outside the house and left, and that she had broken a window to get back into the house to get her clothes. She gave Officer O'Malley the address of the residence from a piece of mail she had seen. Plaintiff also gave Officer O'Malley two cancelled checks made out to "Ron Jackson" which she had taken from the property to aid in the investigation. *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A-6," "B" (Deposition of O'Malley) at p. 46, and "B-14" (Internal Affairs Division Investigation Report) at page Bates Stamped "000014."

On that same day (December 17, 1999), Officer O'Malley interviewed Plaintiff's sister, Patrice Wright, and Plaintiff's friend, Bernice Jones. Ms. Jones told Officer O'Malley about Plaintiff's condition when she arrived at her house on December 16, 1999. According to Ms. Jones, Plaintiff was

hysterical and bleeding, and said that she had been attacked and smelled funny, which Ms. Jones understood to mean that she had been sexually assaulted. *Id.*

Patrice Wright first saw Plaintiff the morning of the 17th, when she came to Ms. Jones' house to take Plaintiff to the hospital. Ms. Wright told Officer O'Malley the account of the events that Plaintiff had told her. The details were consistent with what Plaintiff had reported to both Detective Manning and Officer O'Malley, including Plaintiff's stated reason for reentering the property to get more clothes. *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "A-6."

On December 19, 1999, Officer O'Malley took Plaintiff back to the location where she said the attack had occurred. Plaintiff identified the location as 7024 Cedar Park Avenue. As they drove by, Plaintiff became hysterical, hiding on the floor of the police car, screaming: "Don't go near the door; they're going to kill me; don't go anywhere near them." *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "B" (Deposition of O'Malley) at pp. 28-30.

At that point, Officer O'Malley took Plaintiff back to her mother's house. Plaintiff turned over three large bags of items which she had taken from the property. The bags contained, *inter alia,* clothing, 2 unopened bottles of wine, jewelry, 2 statues, a base for a cordless phone, photographs, and mail. Officer O'Malley made a record of the items turned over, noting that the items were "taken from inside 7024 Cedar Park Avenue to prove she [Plaintiff] was inside the residence." *Id.* at p. 31. *See also* Plaintiff's MSJ Exhibits, Volume I, Exhibit "E", and Defendants' MSJ Exhibits, Exhibit "G."

Officer O'Malley did not process either 7024 Cedar Park Avenue, or Emerald City, for physical evidence as a part of her sexual assault investigation. At her deposition, Office O'Malley testified that she did not do so because the crime scene had already been contaminated when Detective Heeney processed 7024 Cedar Park Avenue as a burglary. However, Officer O'Malley stated that she did not know what Detective Heeney did at that location to process the burglary, so she couldn't know if the evidence of the sexual assault had been contaminated, but "it would have been arguable in court."

7

Officer O'Malley noted that the Special Victims Unit does a totally different investigation than the investigation done for a burglary.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "B" (Deposition of O'Malley) at pp. 65-69, and "B-14" (Internal Affairs Division Investigation Report) at page Bates Stamped "000014."

When Officer O'Malley entered a report of Plaintiff's sexual assault complaint on the "city computer," she received several facsimiles from the Northwest Detectives of the burglary complaint filed by Denise Pue.  At that point, which Officer O'Malley believes was on December 19, 1999, and Detective Heeney testified was shortly after his initial interview with Ronald Jackson, the two police officers were aware of each other's investigations.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A" (Deposition of Heeney) at pp. 46-47, and "B" (Deposition of O'Malley) at pp. 36-37.

Officer O'Malley called Detective Heeney.  They exchanged information about their investigations.  Detective Heeney told Officer O'Malley that he had interviewed Ronald Jackson, and probably told her that he had run a criminal check on Jackson.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A" (Deposition of Heeney) at pp. 47-49, and "B" (Deposition of O'Malley) at pp. 38-40. In his Investigation Report ("75-49"), dated December 17, 1999, Detective Heeney stated that Officer O'Malley had related a summary to him, which included the facts that: (1) Plaintiff had identified one of her attackers as Ronald Jackson; (2) Plaintiff said she had been drugged and awoke to find herself in a bed with the two men putting their clothes back on; (3) After the men put her out of the house, Plaintiff broke a window to get back in to get her clothes; and (4) Items taken out of the residence by Plaintiff were recovered at Plaintiff's mother's house.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "A-3."

Detective Heeney stated in his 75-49 that Officer O'Malley told him that "Plaintiff had committed herself to the Belmont Center on Monument Avenue seeking treatment for drug and alcohol addiction."  *Id.*  Plaintiff had admitted herself to Belmont Center, however, as Officer O'Malley was

aware, Plaintiff was being treated for post-traumatic stress.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "B" (Deposition of O'Malley) at pp. 93-95.  At deposition, Officer O'Malley denied telling Detective Heeney that Plaintiff was being treated for drug and alcohol addiction.  At his deposition, Detective Heeney testified that Officer O'Malley may have said that Plaintiff was being treated at Belmont Center for drug and alcohol abuse, he couldn't remember.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A" (Deposition of Heeney) at pp. 60-61, and "B" (Deposition of O'Malley) at pp. 85-88.

In a Search Warrant Application, dated December 19, 1999, Officer O'Malley sought information about the "911" call which Ronald Jackson talked about in his interview with Detective Heeney.  On this form, Officer O'Malley listed the charges being investigated as both burglary and rape.  *See* Plaintiff's MSJ Exhibits, Volume II, Exhibit "K."[4]

On January 5, 2000, Officer O'Malley had Denise Pue come in and identify the items turned over by Plaintiff.  Officer O'Malley then released these items to Ms. Pue.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "B" (Deposition of O'Malley) at pp. 46-49, and "E."

Over the course of their investigations, Officer O'Malley and Detective Heeney spoke several more times.  At deposition, Officer O'Malley recalled two conversations, Detective Heeney estimated that they had spoken approximately six times.   *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A" (Deposition of Heeney) at p. 78, and "B" (Deposition of O'Malley) at pp. 135-137.

On January 19, 2000, Officer O'Malley received a copy of Plaintiff's lab reports by facsimile from ElSohly Laboratories, Inc.  The reports were negative for Rohypnol (the "date rape" drug), and

---

[4]     The Search Warrant Application is dated 12-19-00, however, this appears to be an typographical error.  In her 75-49 Investigation Report, dated January 24, 2000, Officer O'Malley notes that she had checked INCT records for information about the December 16, 1999 "911" call.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "B-15" (p. 2, "ACTION TAKEN: e).

positive for cocaine and grain alcohol.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A-6" (p.11),

"B-8" (Officer O'Malley's time line, p. 4 at entry for 1/19/00),  and "B-15" (page 2, "ACTION

TAKEN: k).

During her statement to the Internal Affairs Division on September 11, 2001, Officer O'Malley

acknowledged that a person of diminished capacity cannot legally consent to engage in sexual contact.

Officer O'Malley testified that based upon her knowledge and experience, and having had knowledge

that "[Plaintiff] had grain alcohol and cocaine in her system, along with statements describing her as

exhibiting then and in the past, abnormal or less than normal behavior," Plaintiff did not have the ability

on December 16, 1999 to consent to sexual contact.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit

"B-13" at p. 7.

On January 24, 2000, Officer O'Malley closed Plaintiff's sexual assault case as unfounded.

Prior to closing Plaintiff's sexual assault case, Officer O'Malley had:

conducted a total of four interviews[5];

checked Special Victims Unit records and INCT records[6];

conferred with her supervisor;

contacted Detective Heeney in reference to the burglary complaint at 7024 Cedar Park Avenue;

submitted urine samples for testing by ElSohly Labs, and received lab results that were positive for cocaine and grain alcohol, negative for Rohypnol;

inventoried items taken by Plaintiff from 7024 Cedar Park Avenue, and returned them to Denise Pue after Pue identified them as hers;

submitted medical releases to the hospital, obtaining records which revealed that Plaintiff had told hospital staff that she had been raped vaginally by two people and possibly orally and anally, and had discharge and a foul odor;

---

[5]     Officer O'Malley had interviewed Plaintiff, Plaintiff's sister (Patrice Wright), Plaintiff's friend (Bernice Jones), and Denise Pue.

[6]     Plaintiff had made a prior report of sexual assault in 1996.  Officer O'Malley investigated that complaint.  She testified at deposition that the case was left "active" and that no arrests in connection with the 1996 complaint were made. *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "B" (Deposition of O'Malley) at pp. 23-25, and "B-15."

conferred with the Assistant District Attorney "who advised that due to the fact that [Plaintiff] denies any sexual contact and the results of the Rohypnol tests were negative the case should be carried as unfounded."[7]; and

forwarded all pertinent information and interviews to Detective Heeney.

*See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "B-15" at p. 2.

Prior to closing Plaintiff's sexual assault case, Officer O'Malley did *not*:

process either 7024 Cedar Park Avenue, or Emerald City, for evidence of sexual assault;

attempt to locate the cab and/or interview the cab driver, who Plaintiff reported had driven her, after the sexual assault, to Bernice Jones' house;

receive the results from the Johnson rape kit, which was positive for the presence of semen in the vaginal, vulvular and cervical samples submitted by Plaintiff[8]; and

interview and/or attempt to secure blood or saliva samples for DNA testing from Ronald Jackson, despite knowing his address and a telephone number.

*See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "B-13" at pp. 3-7, and "B-14" at pages Bates Stamped

"000004-000005, 000013-000016".

---

[7]    During her statement to the Internal Affairs Division on September 11, 2001, Officer O'Malley explained her decision to close Plaintiff's case as unfounded, after consulting with the ADA as follows:

"I reviewed the case with ADA [ . . . ].  After reviewing the case with him, along with the following: The complainant having no recollection of intercourse occurring, Ms. Wright giving conflicting accounts as to what she was wearing when she awoke at 7024 Cedar Park Avenue, no evidence of the date rape drug Rohypnol, that Ms. Wright tested positive for the presence in her system of grain alcohol and cocaine, and her refusal to answer questions relating to those being in her system (alcohol and cocaine), and her admission of breaking into 7024 Cedar Park Avenue through a window and taking numerous items from the property so many items it was believed it was a burglary of the property, no evidence of a forced injection by needle on Ms. Wright's body, ADA [ . . .] determined there was no prosecutorial merit to the rape allegation."  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "B-13" at p. 5.

[8]    This lab report is dated February 4, 2000, over a week after Officer O'Malley closed Plaintiff's case as unfounded. *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "A-5."

Plaintiff asserts that Officer O'Malley told her that she was closing her sexual assault case as "unfounded" because her Johnson Rape Kit came back negative, and because Plaintiff is a drug and alcohol abuser.  Officer O'Malley denies this.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "B-3" at p. 1, and "B-14" at page Bates Stamped "000015."

On January 24, 2000, Officer O'Malley faxed a copy of records from her investigation of Plaintiff's sexual assault complaint to Detective Heeney.  Detective Heeney looked at them "very, very briefly," because "[his] part in the investigation was concluded at that point. [Detective Heeney] had the affidavit of probable cause."  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A-6," and "A" (Deposition of Heeney) at pp. 111-114.

By January 24, 2000, Detective Heeney had drafted an affidavit of probable cause for an arrest warrant for Plaintiff.  The affidavit is undated, and Detective Heeney testified at deposition that he wasn't sure of the date on which it was drafted, but it was sometime between December 16, 1999 and January 24, 2000.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A" (Deposition of Heeney) at pp. 66-74, and "A-4."

In the affidavit of probable cause, Detective Heeney stated that he believed he had probable cause to arrest Plaintiff for burglary, based upon his interviews with Denise Pue and Ronald Jackson, and Officer O'Malley's interview with Plaintiff.  The affidavit of probable cause incorrectly states that Plaintiff had admitted herself for drug and alcohol treatment, shortly after contacting Officer O'Malley. The affidavit of probable cause does not identify the items which were taken by Plaintiff, namely bags of miscellaneous clothing, jewelry, mail, unopened wine, etc., and two cancelled checks made out to "Ron Jackson."  Nor does it give her reason for taking these items - to prove that she had been in the residence and to aid in the identification of her attackers.  The affidavit of probable cause does not state that, except for the clothing Ms. Pue alleged had been stolen, the remaining items which she identified

as missing - a VCR, two 13" televisions, and $2,000 in cash - were not found in Plaintiff's possession. *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "A-4."

Detective Heeney did not submit the affidavit of probable cause to a judicial officer for signature.  It was sent to the District Attorney's Office, and approved by an ADA on January 30, 2000. Detective Heeney waited "a period of time" before physically arresting Plaintiff.  At deposition, Detective Heeney said he waited because Plaintiff was in treatment at Belmont Center and he wanted to let her finish her course of treatment, and because he wanted to allow Plaintiff to voluntarily surrender at the Police Administration Building, rather than the Northwest Detectives, out of respect for Police Officer Clyde Jones, who is the father of Plaintiff's child.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A" (Deposition of Heeney) at p. 74, and "A-7."

Plaintiff was arrested for burglary, without a warrant, on February 8, 2000.  The arrest report lists the police personnel involved as Detective Heeney and Officer O'Malley.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "B-10."

Prior to Plaintiff's arrest:

Detective Heeney did not interview Plaintiff.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "A" (Deposition of Heeney) at p. 110;

Neither Detective Heeney, nor Officer O'Malley, ran a criminal records check on Denise Pue, which would have shown two arrests for drug dealing, and that she was, at the time of the burglary complaint, on probation for welfare fraud.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A" (Deposition of Heeney) at pp. 50-51, and "A-2";

Officer O'Malley, who had received the results of the Johnson Rape Kit indicating the presence of semen in the samples obtained from Plaintiff and who was aware that Plaintiff was going to be arrested, did not share this information with Detective Heeney.  Detective Heeney, who did not have these results prior to arresting Plaintiff, testified at deposition, that he would have taken this information into consideration because Plaintiff had reported that she re-entered the property to get her clothes and to gather evidence.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibits "A" (Deposition of Heeney) at pp. 71-73, and "B" (Deposition of O'Malley) at pp. 101-103, 123;

13

Detective Heeney upon receipt of the investigative records faxed to him by Officer O'Malley, which "he didn't even request," looked at them "very, very briefly," because "[his] part in the investigation was concluded at that point. [He] had the affidavit of probable cause." *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "A" (Deposition of Heeney) at pp. 111-114, 117.

After her arrest, Plaintiff was re-admitted to Belmont Center, on February 10, 2000, for additional treatment of post traumatic stress. She remained hospitalized through February 29, 2000. *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "B-14" at page Bates Stamped "000009."

On April 3, 2000, Plaintiff appeared for a preliminary hearing before the Honorable Teresa Carr Deni of the Municipal Court of Philadelphia. All charges were dismissed for failure to prosecute. *See* Plaintiff's MSJ Exhibits, Volume I, "Exhibit B-14" at page Bates Stamped "000011."

At the request of Plaintiff, the Women's Law Project, and Women Organized Against Rape, an Internal Affairs investigation was initiated into the handling of Plaintiff's case. Plaintiff's sexual assault case was re-opened on May 4, 2000. Additional interviews were conducted, including: an additional interview with Plaintiff, interviews with her friends, neighbors and witnesses, and two interviews with Nimar Thompson (the second man who was present when Plaintiff was assaulted). DNA samples were obtained from both Ronald Jackson and Nimar Thompson. A DNA lab report, faxed on June 1, 2001, excluded Nimar Thompson as a source of the semen found in Plaintiff's Johnson Rape Kit, and identified Ronald Jackson as the source of the semen. *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "B-14" at page Bates Stamped "000005, 000010-000011," and Volume II, Exhibit "L".

On August 1, 2001, Ronald Jackson and Nimar Thompson were arrested and charged with rape and related offenses in connection with the sexual assault of Plaintiff. *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "B-14" at page Bates Stamped "000011."

14

On November 9, 2001, the Internal Affairs Department issued a report which concluded that Plaintiff's allegation of lack of service by Officer O'Malley was sustained.  The report found that Officer O'Malley had conducted a less than proper/thorough investigation of Plaintiff's sexual assault complaint before improperly closing the case as "unfounded."  *Id.* at page Bates Stamped "000017."

On March 13, 2002, Ronald Jackson and Nimar Thompson both pled guilty to criminal offenses in connection with the sexual assault of Plaintiff.  Both were sentenced to periods of incarceration.  *See* Plaintiff's MSJ Exhibits, Volume I, Exhibit "B" (Deposition of O'Malley) at p. 115.

On the day that Plaintiff was sexually assaulted, December 16, 1999, the City Council of Philadelphia conducted public hearings in response to complaints by victims and advocacy groups concerning the manner in which sexual assault cases had been handled by Philadelphia police officers. A repeated complaint discussed at these hearings was that women reporting sexual assaults were not being taken seriously, were not thoroughly believed, and their complaints were not being adequately investigated.  *See* Plaintiff's MSJ Exhibits, Volume II, Exhibits "T-1" at pp. 13-15, "T-2" at pp. 236-239, "T-3" at pp. 184-186 , and "T-4" at pp. 200-202.

On the date of the public hearings, the City Council issued a report and recommendations related to monitoring the Police Department's response to these complaints.  *See* Plaintiff's MSJ Exhibits, Volume II, Exhibit "R."[9]

In connection with concerns about the handling of sexual assault cases, then Police Commissioner Timoney ordered the Special Victim's Unit to review approximately 2,000 cases of complaints brought in the years 1995-1997.  This review was know as the "2701 Case Review Project." Of the 1,999 cases reviewed, a total of 637 had been improperly closed or downgraded, instead of being investigated as rapes.  *See* Plaintiff's MSJ Exhibits, Volume II, Exhibit "R" at pp. 4-6.  Of the cases

---

[9]      The title of the resolution was "a resolution authorizing the City Council's Committee on Public Safety to hold public hearings to monitor the progress made in improving the handling of sexual assault complaints as set forth in the recommendations adopted by the entire City Council on December 16, 1999."  *See* Plaintiff's MSJ Exhibits, Volume II, Exhibit "R" at p. 3.

returned to the Special Victim's Unit for further investigation as a result of the 2701 Case Review

Project, 27 had been assigned to Officer O'Malley.  Prior to Plaintiff's arrest, Officer O'Malley has

been the subject of at least one citizen complaint for improper investigation of a rape.  *See* Plaintiff's

MSJ Exhibits, Volume II, Exhibits "S-1" and "Z."

## II.  MOTION FOR SUMMARY JUDGMENT.

Summary judgment is appropriate only where there exists no genuine issue as to any material

fact, such that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56©).

> "'When the non-moving party bears the burden of persuasion at trial, the moving party
> may meet its burden on summary judgment by showing that the nonmoving party's
> evidence is insufficient to carry its burden of persuasion at trial.'  *See* Brewer v. Quaker
> State Oil Refining Corp., 72 F.3d 326, 329 (3d Cir. 1995); *see also* Celotex Corp. v.
> Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).  A
> nonmoving party creates a genuine issue of material fact when it provides evidence
> 'such that a reasonable jury could return a verdict for the non-moving party.'  Anderson
> v. Liberty Lobby, Inc.,477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1996)."

Lawrence v. National Westminster Bank New Jersey, 98 F.3d 61, 65 (3d Cir. 1996).

## III.  DISCUSSION.

### A.      The Court of Appeals' Opinion

After considerable discovery, Plaintiff and Defendants both filed motions for summary

judgment.  This Court denied both motions, after which Defendant Police Officers Heeney and

O'Malley filed an interlocutory appeal to the Court of Appeals.  On June 6, 2005, the Court of Appeals

issued its opinion.

The Court of Appeals held, "Because the facts and circumstances within the arresting officers'

knowledge were sufficient to warrant a prudent person believing that Wright had committed the crime

of criminal trespass, we conclude that there was no constitutional violation.  Therefore, we hold that the

officers were entitled to qualified immunity and we will reverse denial of the officers' motion for

summary judgment." *See* Court of Appeals' Opinion, 409 F.3d 595, 596 (2005).  On July 8, 2005, this Court ordered parties to provide memorandums of law on municipal liability regarding the Court of Appeals' Opinion.  *See* Docket Entry No. 79.

After considering Plaintiff's and Defendant City's memoranda, I interpret the Court of Appeals' Opinion to hold that, because no reasonable jury could conclude on the facts alleged that the officers lacked probable cause to arrest Plaintiff for criminal trespass, Plaintiff's Fourth Amendment right to be free of unreasonable search and seizure was not violated.

In accordance with the Court of Appeals' Opinion, I must grant summary judgment for Police Officers Heeney and O'Malley on the basis of qualified immunity, and this Court must also grant *partial* summary judgment for the City because there was no violation of Plaintiff's Fourth Amendment rights.[10]

### B.       Procedural Posture

The Third Circuit, however, did not rule or even comment on any claims outside of the Fourth Amendment violation, and both Plaintiff and Defendant have raised procedural issues regarding the June 6, 2005 Opinion and its relationship to Plaintiff's claim of violation of her rights guaranteed by the Equal Protection clause of the Fourteenth Amendment.

Defendant argues that the text of the Complaint notwithstanding, during pretrial proceedings this case was narrowed by counsel to a Fourth Amendment claim.  Defendant argues Plaintiff has "abandoned" her Equal Protection claim against the City, and thus, in light of the Court of Appeals' decision finding no Fourth Amendment violation, summary judgment must be granted in the City's favor.

---

[10]   Because Defendants Heeney and O'Malley are no longer parties to this action, I will refer to Defendant (singular) or Defendant City.

17

Plaintiff argues that this Court's pre-appeal denial of Defendants' motion for summary judgment still stands as to the Equal Protection claim, and so Defendant is barred from "renewing" its motion for summary judgment.

Rule 8(a) of the Federal Rules of Civil Procedure only requires a claim of relief to include a short and plain statement of the claim showing that the pleader is entitled to relief.  Rule 8(e)(1) confirms there are no technical requirements, and Rule 8(f) commands pleadings shall be so construed as to do substantial justice.  In this case, Plaintiff's Amended Complaint

1. names the City as a Defendant;
2. generally alleges violations of Plaintiff's Fourteenth Amendment rights by the City (*see* the Introduction to the Amended Complaint); and
3. specifically alleges discriminatory conduct by the City (*see* paragraph 10 of the Amended Complaint).

In light of these components of the Complaint and Rule 8, I find the Amended Complaint has satisfied the requirements of Rule 8 in alleging an Equal Protection violation by the City.

However, this finding does not resolve the matter because the City argues that Plaintiff abandoned her Equal Protection claim.  Defendant City is correct that the motions for summary judgment focused on whether there was a Fourth Amendment violation.  I denied Defendants' motion for summary judgment based on a finding that a reasonable jury could conclude that the Defendant officers did not have probable cause to arrest Plaintiff, and were, therefore, not entitled to qualified immunity.

Usually, a denial of summary judgment is not immediately appealable and the case proceeds to trial and verdict, after which appeal is available.  In this case, however, Defendants were allowed to appeal immediately, via a collateral order appeal, by utilizing Mitchell v. Forsyth, 472 U.S. 511 (1985), which held that a denial of qualified immunity is immediately appealable to the extent the denial turns on an issue of law.  472 U.S. at 530.  As stated above, the Third Circuit granted qualified immunity for Defendants Heeney and O'Malley.

Defendant is correct to suggest cases could not be resolved in a just, speedy and inexpensive manner if Plaintiffs, upon losing an appeal, could "convert" their cases and restart litigation anew on a heretofore silent but theoretically cognizable claim.  The Third Circuit, in fact, has a policy against Plaintiffs using a "shotgun pleading approach" to Equal Protection violations, and requires civil rights cases be plead with considerable specificity.  Hynson v. City of Chester, 864 F.2d 1026, 1031 n.13 (3d Cir. 1988)   A collateral order appeal, however, is a unique instrument, and Mitchell only allows its limited use in the particular situation in which qualified immunity as a matter of law is in question.  As the Court of Appeals has held, in a Mitchell collateral order appeal "the question of whether there is sufficient evidence in the summary judgment record to hold [for the defendant] in the case is precisely the sort of question that we may not entertain in a collateral order appeal."  Eddy v. Virgin Islands Water and Power Authority, 256 F.2d 204, 211 (3d Cir. 2001).  Thus, on appeal from the denial of Defendants Heeney and O'Malley's claim of qualified immunity on the Fourth Amendment issue, the Third Circuit could not have heard arguments on the factual sufficiency of Plaintiff's Equal Protection claim.  Such appeal can only be asserted after trial.

With respect to the Equal Protection claim, then, this case is in the same procedural posture as it was before the collateral order appeal: post-summary judgment.  I have already broadly denied Defendants' Motion for Summary Judgment, but this ruling was argued by parties, and decided by me, in the context of Plaintiff's claim of a Fourth Amendment violation.  Because a collateral order appeal was not even available to Defendant on the factual sufficiency of Plaintiff's Equal Protection claim, Defendant will not be prejudiced by this Court reviewing such claim in detail now.  Nor will the Plaintiff be prejudiced, given that both Plaintiff and Defendant have provided thorough memoranda on the factual sufficiency of the Equal Protection claim.

**C. Plaintiff's Equal Protection Claim**

I am first presented a simple question by the Court of Appeals ruling: if, as a matter of law, Plaintiff's Fourth Amendment rights were not violated by the arrest, then can Plaintiff claim an Equal Protection violation?  As would be expected given the independence of constitutional protections, Third Circuit precedent answers "yes."  "Plaintiffs' Equal Protection claims under the Fourteenth Amendment require a wholly separate analysis from their claims under the Fourth Amendment."  Carrasca v. Figueroa, 313 F.3d 828, 836 (3d Cir. 2002).  Applied to the facts in this case, probable cause to arrest Plaintiff for criminal trespass does not negate the allegation that the City discriminated against Plaintiff because of her gender and her status as a sexual assault victim.

The second, and final, question presented is whether Plaintiff has stated an actionable claim of violation of her right to Equal Protection.  In Hynson v. Chester, the Third Circuit held that, "In order to survive summary judgment, a plaintiff must proffer sufficient evidence that would allow a reasonable jury to infer that it is the policy or custom of the police to provide less protection to victims of domestic violence than to other victims of violence, that discrimination against women was a motivating factor, and that the plaintiff was injured by the policy or custom."  864 F.2d 1026, 1031 (3d Cir. 1988).  Both parties agree the reasoning in Hynson can be adapted to sexual assault victims in principle (*see, e.g.,* Defendant's Memorandum on Municipal Liability, page 5).

**1. Plaintiff's Injury Allegedly Caused by the City Policy or Custom**

I begin my analysis with the final Hynson prong, which requires Plaintiff to proffer evidence of both an injury and a causal link between the City's policy or custom and the injury.  Defendant argues that Plaintiff can demonstrate no actionable injury caused by the City, and that the City was effectively vindicated by the Third Circuit's determination that Plaintiff's arrest was not unreasonable.  The Supreme Court, however, has held, "the constitutional basis for objecting to intentionally

discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment Analysis." <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996).

The Sixth Circuit has interpreted <u>Whren</u> to "confirm[] that an officer's discriminatory motivations for pursuing a course of action can give rise to an Equal Protection claim, even where there are sufficient objective indicia of suspicion to justify the officer's actions under the Fourth Amendment." <u>Farm Labor Org. Comm. v. Ohio State Highway Patrol</u>, 308 F.3d 523, 533.  I agree with the Sixth Circuit's analysis of <u>Whren</u>.  Constitutional rights are conjunctive, not disjunctive.  Even if Plaintiff's *only* alleged injury was the arrest, and even if the arrest did not violate her Fourth Amendment rights, Plaintiff would have alleged sufficient injury for a viable Equal Protection claim because she still allegedly suffered an arrest motivated in whole or in part by official discrimination.

Regarding causation, the causal link between an alleged discriminatory City policy and the implementation of that policy by the City's police officers in the form of an injury to the Plaintiff is clear.  Beyond such a *prima facie* showing of causation, "The Third Circuit has held that the causation inquiry is mainly a fact question to be determined by a jury." <u>Burella v. City of Philadelphia</u>, 2003 U.S. Dist. LEXIS 25170 at 33 (E.D. Pa. 2003), *citing* <u>Bielevicz v. Dubinon</u>, 915 F.2d 845 (3d Cir. 1990), and <u>Colburn v. Upper Darby Twp.</u>, 838 F.2d 663 (3d Cir. 1988).  Thus, Plaintiff has alleged both an actionable injury and sufficient causation to create an issue of fact, and so I conclude that Plaintiff has satisfied the third <u>Hynson</u> prong.

**2. Discrimination as a Motivating Factor**

Continuing backwards to the second <u>Hynson</u> prong, Plaintiff must proffer sufficient evidence that discrimination was a motivating factor in the City's conduct.  The City has argued that "Plaintiff failed to establish that the city intended to invidiously discriminate against sexual assault victims or women." *See* Defendant's Memorandum on Municipal Liability, page 10.

The <u>Hynson</u> standard does not require proof of intentional discrimination.  In fact, the whole purpose of the three prong standard in <u>Hynson</u> is to "enunciate the standard for [a plaintiff's] prima facie case" in civil rights suits when the plaintiff did *not* proffer sufficient evidence of intentional discriminatory conduct.   864 F.2d at 1031.  When a plaintiff satisfies the three prongs of the <u>Hynson</u> standard, she has proffered sufficient evidence such that "a jury could infer, based on this evidence, that the City and Police Department acted with a discriminatory motive in pursuing this policy, and that her injuries were a result of the policy." <u>Hynson</u>, 864 F.2d at 1030-1031, *quoting* <u>Watson v. Kansas City</u>, 857 F.2d 690, 696 (10th Cir. 1988).  The City cites <u>Arlington Heights v. Metropolitan</u>, 429 U.S. 252 (1977), for the proposition that "proof of discriminatory intent or purpose is required to prove an Equal Protection claim," but <u>Hynson</u> itself quotes <u>Arlington Heights</u> for the proposition that "Sometimes a clear pattern . . . emerges from the effect of the state action even when the governing legislation appears neutral on its face."  864 F.2d at 1029.  <u>Hynson</u> provides the standard by which allegations of such a "clear pattern" are judged.

In <u>Burella v. City of Philadelphia</u>, the *only* evidence offered by the Plaintiff of a discriminatory motive was,

> the deposition testimony of Sergeant Francis Healy, who was the Special Assistant to then-Police Commissioner John Timoney and was designated by the City as its representative for certain purposes of this litigation. Sergeant Healey stated that victims of domestic violence are predominantly women. Plaintiff also has a report that finds the Philadelphia Police Department has discriminated against female victims of domestic violence. Lastly, Plaintiff offers the manner in which the Police Department handled her own domestic abuse situation.

2003 U.S. Dist. LEXIS 25170 (E.D. Pa.), page 37.  (citations removed)

The Court reasoned, "However, because the Court's role in deciding motions for summary judgment is not to weigh the evidence and because all reasonable inferences must be drawn in a light

most favorable to the Plaintiff, the Court finds that the evidence adduced by Plaintiff is sufficient to create a genuine issue of material fact as to whether the City's custom discriminated against women."

Id.

Plaintiff in this case has proffered very similar evidence and more, including the depositions of the Police Officers involved in the case, the findings of the "2701 Case Review Project," and the Internal Affairs Division investigation.  This Court finds such evidence meets the second Hynson prong.

### 3. A Policy or Custom of the Police to Provide Less Protection to Victims of Domestic Violence Than to Other Victims of Violence

The first Hynson prong essentially recapitulates the Monell standard for recovery against a municipality under § 1983.  This Court again refers to Burella for an explanation of the standard:

> A "policy is made when a decision maker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." Bielevicz v. Dubinon, 915 F.2d 845, 850 (1990) (internal quotations omitted). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically authorized by law is so well settled and permanent as virtually to constitute law." Id. The existence of a "custom may be established by proof of knowledge and acquiescence." Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989).

2003 U.S. Dist. LEXIS 25170, page 30.

The Court in Burella was presented with less evidence than Plaintiff has produced here.  In Burella,

> Plaintiff next argues that a custom or course of conduct among the City's police officers to not enforce protection orders existed at the time Plaintiff was shot. Plaintiff alleges that police officers were confused as to their authority under the law to arrest violators of protection orders. Plaintiff also alleges that officers did not know whether to make an arrest for a violation of an order or to just advise the complainant of his or her rights. It is further alleged that the City knew of the confusion among its police officers for some time prior to January 12, 1999, when the Plaintiff was shot.

2003 U.S. Dist. LEXIS 25170, page 33.

Burella, when considering the standard by which evidence is interpreted in a motion for summary judgment, again ruled that Plaintiff had proffered sufficient evidence was produced to survive the first prong of Hynson.  Here, Plaintiff has offered the results of the "2701 Case Review Project" plus

public testimony before City Council of a number of scholars and public interest lawyers who have investigated the issue and found disparate treatment for victims of sexual assault.

**D. Conclusion**

Upon review, I hold that the Third Circuit's Opinion on interlocutory appeal compels me to dismiss the Fourth Amendment claims against Police Officers O'Malley and Heeney and against the City. However, the Third Circuit's Opinion does not affect my original denial of summary judgment regarding the Fourteenth Amendment claim against the City. That denial of summary judgment still stands. When considering the fairness to the parties, however, this Court considers it appropriate to rule on Defendant's Renewed Motion for Summary Judgment regarding that Fourteenth Amendment claim. This Court holds that Plaintiff has met her burden of proffering sufficient evidence to survive summary judgment on the Equal Protection claim under the standard outlined by the Court of Appeals in Hynson.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KIMBERLY MARNELL WRIGHT              :         CIVIL ACTION
                                     :
          v.                         :
                                     :
CITY OF PHILADELPHIA, et al.         :         NO. 01-6160


**O R D E R**


AND NOW, this 17th day of November, 2005, upon consideration of Defendant City of

Philadelphia's renewed motion for summary judgment, Plaintiff's response, and consistent with the

Court of Appeals' decision and the discussion which follows, it is hereby **ORDERED** that


1.  Defendant City of Philadelphia's Renewed Motion for Summary Judgment

(Docket Entry No. 82) is **GRANTED IN PART, DENIED IN PART**.

2.  Judgment is entered in favor of the Defendants on Plaintiff's Fourth Amendment

claim.

3.  Plaintiff's Equal Protection Claim against the Defendant City of Philadelphia will

be tried by jury.


BY THE COURT:


_____
M. FAITH ANGELL
CHIEF U.S. MAGISTRATE JUDGE