IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KIMBERLY MARNELL WRIGHT      :      CIVIL ACTION
                           :
         v.                 :
                           :
CITY OF PHILADELPHIA          :      NO. 01-6160

**MEMORANDUM AND ORDER**

M. FAITH ANGELL
UNITED STATES MAGISTRATE JUDGE                March 26, 2007

       Beginning on May 4, 2006, the above-captioned matter was tried by jury before this

Court. On May 11, 2006, the jury returned a verdict in favor of Plaintiff and awarded her the

sum of $610,000.00. Defendant City of Philadelphia has filed a motion for judgment as a matter

of law, or in the alternative, for a new trial or remittitur. For the reasons set forth below, the

Defendant City of Philadelphia's motion for judgment as a matter of law is granted.

       Although my ruling on the City's post trial motion is adverse to Plaintiff, I recognize, and

am sensitive to, the pain and anguish Plaintiff has endured. Nevertheless, I may not base my

rulings on sympathy, but am required to rule on the legal issues presented.

**I. INTRODUCTION AND BACKGROUND.**

       Because I write only for the parties, I will not repeat the facts of this case in detail, except

as they are relevant to issues raised in the pending post-trial motion.

       At the conclusion of a week long trial, the jury returned a verdict in favor of Plaintiff on

her Equal Protection claim against the City of Philadelphia. The jury found, in response to Jury

Interrogatories, that Plaintiff had proved by a preponderance of the evidence that:

> (1) the City of Philadelphia had a custom or practice of downgrading, closing and/or miscoding sexual assault complaints, failing to investigate reported sexual assaults and/or mistreating victims of sexual assault crimes;
> (2) the City of Philadelphia had a custom or practice of failing to adequately train its police officers in handling sexual assault cases;
> (3) the City of Philadelphia's custom or practice was discriminatory in that it denied Equal Protection to victims of sexual assault, there was no rational basis for the City of Philadelphia to deny Equal Protection to victims of sexual assault, and the discriminatory practice or custom was the moving force or substantial factor in causing harm to Kimberly Wright; and
> (4) the amount of money which is fair and reasonable to compensate Plaintiff for damages which she suffered as a result of the violation of her Equal Protection rights is $610,000.00.

*Minute Sheet Dated May 11, 2006*: Attached Jury Interrogatories [Docket Entry No. 135].[1]

## II.  DEFENDANT CITY'S MOTION FOR JUDGMENT AS A MATTER OF LAW.

Under Rule 50(a) of the Federal Rules of Civil Procedure, "motions for judgment as a matter of law may be made at any time before submission of the case to the jury."  The Rule 50(a) motion "shall specify the judgment sought and the law and facts on which the moving party is entitled to the judgment."  Fed.R.Civ.P. 50(a)(1) and (2).

Under normal circumstances, a defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiff on notice waives the defendant's right to raise the issue in its renewed motion for judgment as a matter of law under Rule 50(b). However, when the plaintiff fails to oppose the defendant's Rule 50(b) motion on the basis that the defendant did not specifically preserve the issue under Rule 50(a)(2), the plaintiff's right to object on that basis is itself waived.  *Williams v. Runyon*, 130 F.3d 568, 571-72 (3d Cir. 1997).

---

[1]    The jury found that Plaintiff had **not** proved by a preponderance of the evidence that the City of Philadelphia had a custom or practice of selectively prosecuting sexual assault victims, and found in favor of the City on Plaintiff's Equal Protection claim based on gender.  *Id.*

Having reviewed the City's oral Rule 50 motion, I believe some of the issues raised in the City's renewed motion for judgment as a matter of law were not specifically raised at trial in the City's Rule 50(a) motion.  *See N.T. 5/9/06 at 52-58, 61-64.*  Plaintiff has not argued waiver as to the scope of the issues raised in the City's Rule 50(b) motion.  However, the issues which I find critical to deciding this motion, Plaintiff's failure to establish deliberate indifference and failure to establish a failure to train, were raised in the City's oral Rule 50(a) motion.  *Id.* at 54-56.

### A.  Applicable Standards.

Both parties cite *McDaniels v. Flick,* 59 F.3d 446 (3d Cir. 1995), as setting forth the applicable standard under Rule 50.  In *McDaniels*, the Third Circuit stated:

> Such a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.  In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.

*McDaniels,* 59 F.3d at 453 (3d Cir. 1995)(*citing Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)), *cert. denied*, 516 U.S. 1146 (1996).

"Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability.  The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."  *Austin v. Norfolk Southern Corp.,*158 Fed. Appx. 374, 377 (3d Cir. 2005)(not precedential).

**B.  There Was Insufficient Evidence Upon Which The Jury Reasonably Could Find Municipal Liability.**

The City asserts that it is entitled to judgment as a matter of law on Plaintiff's Equal Protection claim because Plaintiff did not produce any evidence to support a finding of municipal liability.  *"Memorandum Of Law In Support Of Defendant City Of Philadelphia's Motion For Judgment As A Matter Of Law Or, In The Alternative, For A New Trial Or Remittitur"*[2] [Docket Entry No. 155] at p. 17.  The City makes two arguments in support of this assertion: (1) the testimony of Plaintiff's expert, Professor Michelle Anderson, was insufficient to support a claim of municipal liability, and (2) Plaintiff failed to adduce sufficient evidence of intent to discriminate against sexual assault victims.  *Id.* at pp. 18-22.[3]

### 1.  Any Post-trial Challenge To Professor Anderson's Testimony Is Waived.

With regard to Professor Michelle Anderson, the City asserts that her expert testimony was "purely theoretical."  Her testimony "offered numerous conclusions but these conclusions were unsupported by the record evidence," and it is "insufficient to support Plaintiff's municipal liability claim because Plaintiff failed to develop evidentiary support for the factual conclusions upon which Professor Anderson's opinions were based."  *Id.* at pp. 21-22.

As Plaintiff notes, any post-trial challenge to Professor Anderson's expert testimony is waived.  Prior to trial, the City made no *Daubert* challenge to her testimony.  At trial, Professor Anderson was qualified as an expert in the area of the investigation and prosecution of sexual assault laws, without objection by the City.  *N.T. 5/8/06* at pp. 5-12.  The City cannot challenge

---

[2]    Hereinafter "Memo in Support of City's Post-Trial Motion."

[3]    For the purposes of this discussion, I have reversed the order of the City's two municipal liability arguments.

Professor Anderson's expert testimony in its renewed motion for judgment as a matter of law,

when it did not objection to this testimony before filing its post-trial motion.  *See Kiss v. K-Mart*,

Civ.A. 97-7090, 2001 WL 568974 at *6 (E.D. Pa. May 22, 2001)(by failing

to object to expert testimony at trial, plaintiff waived any right to object to the expert testimony

in post-trial motions).[4]

> **2.  Viewed In The Light Most Favorable To Plaintiff, There Was Sufficient Evidence To Support A Finding Of A Custom Or Practice, And Knowledge By Timoney.**

I am not persuaded by the City's argument that Plaintiff "failed to adduce sufficient

evidence of all but the miscoding of sexual assault cases."  *Memo in Support of City's Post-Trial

Motion* at p. 19.  There was sufficient evidence from which a jury could find a custom or practice

of downgrading, closing and/or miscoding sexual assault complaints, failing to investigate

reported sexual assaults and/or mistreating victims of sexual assault crimes.

As the City itself acknowledges, Professor Anderson testified that in 1999 to early 2000,

the Philadelphia Police Department had institutional bias against sexual assault victims which led

to the mistreatment of women who came forward with sexual assault allegations.  *Id.* at pp. 21-

22.

---

[4]       Assuming *arguendo* that I were to reach the merits of the City's challenge to Professor Anderson's testimony, I would find that her expert testimony had an adequate factual foundation and that the City's objections go merely to the weight, rather than the admissibility, of this evidence, which is a matter for the jury.  *See Matlin v. Langkow*, 65 Fed. Appx. 373, 382-83 (3d Cir. 2003)(not precedential)(an expert's opinion is sufficiently reliable for admissibility purposes if it both rests on a reliable foundation and is relevant to the task at hand; concerns that the expert's opinion was "rendered without sufficient support" go to weight rather than admissibility).

Viewing the evidence in the light most favorable to the Plaintiff, Professor Anderson testified that the institutional bias that existed in the Philadelphia Police Department affected how the Department dealt with both its "unfounded rate" and its coding of these cases as 2701. She concluded that the "extraordinarily high" percentages in both of these numbers were examples of institutional bias. *N.T. 5/8/06* at pp. 15-16.

Professor Anderson testified that this institutional bias led to mistreatment of the sexual assault victims in a variety of ways: over scrutiny, hostility, victim blaming and criticism when a woman came forward with sexual assault complaints; and "getting rid of [sexual assault] cases by either deterring the victim from proceeding, shunting it into a 2701, [or] unfounding the claim." *Id.* at pp. 17-19. During the period from 1999 to 2000, more training was required in the Philadelphia Police Department about how to handle sexual assault victims, "how not to engage in victim blaming[,] how to come forward with some sympathy and empathy for the victim when she comes forward." *Id.* at p. 21.

Professor Anderson concluded that "the bias against women existed and that the bias ended in claims, legitimate claims, of sexual assault and rape not being taken seriously, not pursued appropriately by the police department, and thrown into either the administrative dead zone or an unfounded claim." *Id.* at p. 22.[5]

In addition to Professor Anderson's testimony as to institutional bias, there was other evidence from which the jury could reasonably find a custom or practice of differential treatment of sexual assault victims, and that Police Commissioner Timoney was aware of this custom or practice.

---

[5]     Again, the City's complaints as to the evidentiary support for Professor Anderson's conclusions go to the weight of her testimony, which may not be reassessed by the Court on a motion for judgment as a matter of law.

Plaintiff presented the testimony of Vincent DeBlasis, who was Chief of the Detective Bureau (which included the Sex Crimes Unit) from 1994 through 1998.  In 1998, DeBlasis was assigned to the newly created Quality Assurance Bureau, where he remained until 2002.  *N.T. 5/4/06* at p 41-42.  Chief DeBlasis testified that while he was in the Philadelphia Police Department, he was aware of downgrading of crimes by the Department.  In 1997, Chief DeBlasis received complaints from Chief Inspector Charles Brennan about the improper use of 2701 designations in the Sex Crime Unit.[6]  Chief DeBlasis called the commanding officer of the Sex Crimes Unit (Captain Bonner) and told her to stop classifying rapes as 2701 (investigation of person, a non-crime category).  *Id.* at 51-54.

In March 1998, when Commissioner Timoney was appointed, DeBlasis was Chief of Detectives.  DeBlasis testified that Timoney called him into his office and told DeBlasis that he was going to be transferred to a new unit - the Quality Assurance Bureau.  At that time, DeBlasis and Timoney discussed the downgrading problem.  DeBlasis told Timoney that "ever since [he] was in the police department, we didn't code correctly.  We didn't conform to the standards and the definition in that Uniform Crime Booklet."  DeBlasis told Timoney that downgrading was part of the police culture, and that there was insufficient training in the area of coding.  *Id.* at 54-56.  According to DeBlasis, the miscoding was intentional, "they coded the report wrong on purpose."  *Id.* at 56-57.  DeBlasis testified that "you need accurate and timely data."  Without it, "[ . . . ] you are not seeing the whole picture.  You don't see the whole problem.  So, naturally any strategy you undertake is based on flawed data that you are looking at."  *Id.* at 60.

---

[6]       In 1998, the Sex Crimes Unit was renamed the Special Victims Unit.  *N.T. 5/5/06* at p. 27.

Plaintiff presented the testimony of then Police Commissioner Timoney, who testified before City Council on December 6, 1999 at a public hearing "on the efficacy of the investigation and prosecution of sex crimes in the city including but not limited to the practices and procedures of the Philadelphia Police Department's Special Victim's Unit's use of a non-offense 'Code 2701' and 'Code 2625' in order to keep many rape cases out of the crime tally, the adequacy of the location and facilities for servicing rape victims and any current proposals by the Police Department, the FBI and other criminal justice system experts, advocacy groups and citizens on how these crimes should be handled in the City of Philadelphia." *N.T. 5/4/06* at pp. 96-98; *Plaintiff's Exhibit "I."*

Timoney acknowledged that he had inherited practices going back to the 1980's where the 2701 code was used as a "catch basin for those who couldn't make a decision on what they were." According to Timoney, the problem with the 2701 code was that there were some rapes in there "that required an investigation. It would have been okay to put them in there if there was a correct case management system in place that would have created a file that would force supervisors to ask, Det. Kenney, what about this case you have in 2701? Well, that didn't exist. And, as a result, there was – there was slippage clearly." *Id.* at pp. 112-115.

There was sufficient evidence to support a finding of a custom or practice of downgrading, closing and/or miscoding sexual assault complaints, failing to investigate reported sexual assaults and/or mistreating victims of sexual assault crimes, and knowledge of the custom or practice by Commissioner Timoney.

**3.  Viewed In The Light Most Favorable To Plaintiff, There Was Insufficient Evidence To Support A Finding Of Deliberate Indifference By Timoney.**

I am persuaded by the City's argument that Plaintiff failed to adduce sufficient evidence to support a finding that Commissioner Timoney was deliberately indifferent to remedying the problems that had been identified regarding the treatment of sexual assault victims.  *Memo in Support of City's Post-Trial Motion* at p. 19.

As noted earlier, Plaintiff presented testimony of Commissioner Timoney given at a December 6, 1999 hearing before City Counsel.  At that hearing, Commissioner Timoney "walked [City Council members] through the process that began in regards to reorganizing the Philadelphia Police Department upon taking office in March of 1998."  *N.T. 5/4/06* at p. 103. Timoney testified that immediately upon taking office, he conducted a series of interviews with persons in the Police Department, chose Jack Maxwell as Chief of Detectives, and set up a transition office.  Within a few months, Chief Maxwell had presented Timoney with a plan for "overhauling and reorganizing structurally the detective bureau."  From early 1998 through the fall of 1998, the initial part of the reorganization - "personnel transfers and promotions and moving people about"- took place.  By the end of 1998, the Special Victims Unit was in place. Timoney placed Joe Mooney in charge of the Special Victims Unit, and began to move in other personnel (sergeants, lieutenants, and for the first time ever, detectives) to the unit.  Timoney testified that he "took the single best Captain in Internal Affairs with investigative experience and put him in charge of the Special Victims to make sure [he] had top notch people running the unit."  *Id.* at pp. 103-105.  Timoney testified that it was "a long elaborate process" to develop "a case management unit where supervisors would be held strictly accountable for the cases of the

detectives they supervised."  The Police Department had created an improved ComStat process where the various units, including Special Victims, "grilled" detectives and officers on patrol every two weeks, regarding how they were handling cases.  *Id.* at 105-106.

According to Timoney, as of December 6, 1999, the Special Victims Unit was not a "perfect police department," but it was "moving in the right direction, making change wherever we can and taking suggestions from everybody that has good ideas, including people outside the department."  *Id.* at pp. 105-106.  Timoney extended offers to advocate groups to come in and look at the way coding was done in the Special Victims Unit, and to make suggestions for improvement, based on their knowledge in this area.  *Id*. at p. 120-121.

Timoney had plans, when the current police class finished its training to add more detectives to the Special Victims Unit.  The new detectives would get three to four weeks of additional training in a centralized unit, "like a field training experience that young kids get that are coming out of the academy."  *Id.* at 107.

Commissioner Timoney testified that they had done vast improvements in identification and data analysis as part of the ComStat process, which had led to a "good change" in getting information out there.  The Police Department had formalized meetings between Homicide, the Special Victims Unit and the lab, once a month, to go over priority cases.  *Id.* at 107-108.

According to Commissioner Timoney, physical arrests by investigators in the Special Victims Unit were up by fifty percent.  Total arrests were up by fifty-five percent.  Investigations were up twenty-four percent, and search warrants were up one hundred percent.  *Id.* at pp. 108-110.

Commissioner Timoney testified that they were trying "to be as open as possible" in all departments, including the Special Victims Unit, by making the Commissioner and his staff available to address questions from the press. The "bottom line" according to Commissioner Timoney was that the Police Department was constantly trying to improve, and "we're giving it our best effort to constantly improve how we do police work in the City of Philadelphia." *Id.* at pp. 110-111.

When asked about "2701" cases and how many were involved, Commissioner Timoney stated that he had an idea of the numbers, that the Quality Assurance Bureau was reviewing the cases and that he would get the numbers to City Council when the review was completed. *Id.* at 115, 118.

Plaintiff presented testimony given by Commissioner Timoney at a City Council hearing on January 24, 2001, in which he discussed the 2701 Case Review final report. *Id.* at pp. 142-146.

Plaintiff also presented the testimony of Chief DeBlasis who testified that in the fall of 1999, Timoney asked him to do a review of the cases coded 2701 in the Sex Crimes Unit for the years 1995, 1996 and 1997, which totaled 2,503 cases. *Id*. at 60-63. On January 18, 2000, DeBlasis submitted a report to Timoney. In this report, DeBlasis noted that only 142 of the 2,503 cases reviewed had been correctly coded. 351 had been incorrectly coded as 2701. Of these 351 cases, 70 should have been coded as rape or attempted rape, with 15 of the 70 being "unfounded." 2,010 cases were returned to the Special Victims Unit for further investigation. *N.T. 5/4/06* at pp. 68-71; *Plaintiff's Exhibit "M-2."* Timoney assigned 45 additional detectives to the Special Victims Unit to help the unit review the 2,010 cases returned for further investigation. *Id.* at 72.

Plaintiff presented testimony from Carol Tracy, the Executive Director of the Women's Law Project in Philadelphia.  Ms. Tracy testified that her organization had been contacted by the Philadelphia Inquirer in connection with an investigative series related to the treatment of sex crimes by the Philadelphia Police Department.  Prior to testifying at public hearings before City Council, Ms. Tracy contacted Commissioner Timoney and asked him to meet with a group of advocates to discuss the allegations in the Philadelphia Inquirer.  Timoney first met with the group of concerned advocates in October 1999.  The group of advocates told Timoney that a public airing about the Inquirer allegations was necessary.  Timoney agreed to participate in the public hearings, "talked about the reorganization in the department," and agreed to have ongoing meetings with the advocates "to work with [them] to both deal with any complaints and to review and change some of the practices in the department." *N.T. 5/5/06* at pp. 56-58, 60.  The advocates wanted Timoney to investigate all of the allegations back to the statute of limitations. Initially, Timoney was only interested in investigating allegations for a two-year period. However, at the City Council hearings, Timoney announced that he would investigate allegations for a five-year period, back to the statute of limitations.  Ms. Tracy confirmed that Timoney assigned 45 recently appointed detectives to reinvestigate cases under the supervision of the Quality Assurance Bureau.  *Id.* at pp. 58-59.

After the December 6, 1999 City Council hearing, Timoney continued to meet with the group of advocates.  He invited them to participate in a review of the coding system.  The advocates compared the Philadelphia coding manual with the Uniform Crime Code and concluded that the coding manual was inaccurate in several major instances.  They made suggestions to Timoney on how to correct the coding manual, and asked him to include instances

of crimes that were also domestic violence crimes.  Timoney accepted many of the advocate's recommendations.  Timoney also invited the advocates to contact Captain Mooney, the head of the Special Victims Unit, if they had complaints about the treatment of any victims.  *Id.* at pp. 59-61.

In early January 2000, Ms. Tracy contacted Captain Mooney when a rape victim was told that she was scheduled to take a polygraph test.  Captain Mooney stated that all polygraph examinations had to be approved by him, and confirmed that a polygraph test had been scheduled for the victim by someone other than himself without his approval.  Captain Mooney reassigned the victim's case to two other investigators and an arrest was subsequently made.  *Id.* at pp. 61-62.

In early 2000, in addition to working on the coding manual, Ms. Tracy and other advocates were looking at training and protocol issues with Captain Mooney and Timoney.  *Id.*

Ms. Tracy first became involved in Plaintiff's case in February 2000.  After meeting with Plaintiff and referring her to counsel to defend her against the criminal charges, Ms. Tracy called Captain Mooney, described Plaintiff's case to him and told him that there were a number of issues which concerned her.  Captain Mooney agreed to look into Plaintiff's case.  Shortly thereafter, a group of advocates were invited to do a case review of all of the unfounded cases. Ms. Tracy explained why: "Commissioner Timoney said that there was a loss of confidence and he, in addition to having the public hearings about this and the reinvestigation that was taking place, he thought it was important to have the women's groups, as he called us, actually review the unfoundeds, because he said he had virtually eliminated any 2701 category.  So the issue would be the unfoundeds to make sure that they were doing the right thing."  *Id*. at pp. 62-63, 66-68.  The advocate groups reviewed 105 cases of unfounded rape in 1999, and sat with Captain

Mooney and two Lieutenants to ask questions about cases that concerned them.   "Several" of the 105 cases were ultimately reopened and arrests were made.  *Id.* at pp. 77-78.

The Philadelphia Police Department and Ms. Tracy (and her colleagues from the Women's Law Project) seriously disagreed "and really argued" over Plaintiff's case.  However, Ms. Tracy and the other advocates "were having a good professional relationship with the police department," and the Special Victims Unit was receptive to the concerns expressed by the advocates about the way cases were handled.  *Id.* at pp. 70-72, 83.  While an arrest was eventually made in Plaintiff's case, the process took months and they were "frustrated at how slow this was."  *Id.* at p. 80.

Ms. Tracy talked to Captain Mooney about issues related to the handling of sexual assault investigations, such scheduling a polygraph examination of the victim and interviewing techniques that sounds more like interrogation techniques.  *Id.* at pp. 78-79.

In response to the City's motion for judgment as a matter of law, Plaintiff argues:

> "the Commissioner's actions came far too late to prevent the harms that the long-standing institutional bias caused the Plaintiff.  Even after he ordered that Code 2701 was not to be used, police investigators continued to mistreat sexual assault victims by finding their complaints to be 'unfounded' at an exceptionally high rate and through the use of the same stereotypes of victims that had skewed investigations for so many years.  As of December 1999, when Commissioner Timoney was underlinestarting/underline to effectuate some of the reforms, the 'culture' of bias and mistreatment was still operative and, as the facts regarding the improper investigation of Plaintiff's case make clear, the institutional bias continued to harm sexual assault victims.  The mistreatment of Plaintiff reflects the long-standing police culture and bias against these victims.  Further, training was still inadequate and investigators were not properly disciplined or supervised."

*Plaintiff's Memorandum Of Law In Response To Defendant's Post-Trial Motions*[7] [Docket Entry No. 156] at p.18.

_____

[7]        Hereinafter "Plaintiff's Memo in Opposition."

As discussed earlier, the evidence, viewed in the light most favorable to Plaintiff, was sufficient to support a finding that there was a long-standing bias in the Philadelphia Police Department against sexual assault victims, which was manifested in a custom or practice of downgrading, closing and/or miscoding sexual assault complaints, failing to investigate reported sexual assaults and/or mistreating victims of sexual assault crimes, and that Commissioner Timoney had knowledge of the custom or practice as early as 1998. However, a mere awareness of the problem in 1998 and a need for improvement is not, as a matter of law, sufficient to impose municipal liability for the treatment Plaintiff received from the Special Victims Unit in December 1999.

The evidence does not support a finding of deliberate indifference by Timoney, rather it demonstrates an effort to improve the Philadelphia Police Department's practices and procedures relating to the handling of sexual assault cases. Upon taking office in March 1998, Timoney began reorganizing the Philadelphia Police Department. By the end of 1998, he had the Special Victims Unit in place. He took steps to develop a case management system which would provide more oversight by supervisors. Timoney asked Chief DeBlasis to do a review of cases coded 2701 for the years 1995-1997. Twenty-five hundred cases were reviewed, approximately two thousand were returned to the Special Victims Unit for further investigation. Forty-five new detectives were assigned to the Special Victims Unit to help review the two thousand returned cases. Timoney testified that he involved people from outside the Police Department, and sought outside input during the reorganization process. Ms. Tracy confirmed that advocate groups had a good professional relationship with the Police Department and that the Special Victims Unit was receptive to the concerns expressed by the advocates about the way cases were handled.

Commissioner Timoney testified in December 1999 that total arrests by investigators in the Special Victims Unit were up by fifty-five percent, physical arrests were up by fifty percent, investigations were up by twenty-four percent, and search warrants were up by one hundred percent.

The evidence, viewed in the light most favorable to Plaintiff, was insufficient to establish that Commissioner Timoney made a deliberate choice to eschew corrective measures or acquiesced in the long-standing custom or practice of downgrading, closing and/or miscoding sexual assault complaints, failing to investigate reported sexual assaults and/or mistreating victims of sexual assault crimes.  The evidence shows that Timoney was not indifferent to the problems in the handling of sexual assault cases.  Rather, as early as March 1998, he was taking affirmative steps to remedy the situation.

### C.  There Was Insufficient Evidence To Support A Failure To Train Finding.

The City argues that Plaintiff's failure to train claim should not have been submitted to the jury, and that this claim must fail because Plaintiff failed to produce any evidence on the training that police officers received, and failed to establish a direct causal link between the City's alleged discriminatory custom or practice of failing to adequately train police officers and the constitutional violation at issue in this case.  *Memo in Support of City's Post-Trial Motion* at pp. 27-28.

There are limited circumstances in which an allegation of "failure to train" can be the basis for municipal liability.  *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 1204 (1978).

In order to establish municipal liability on a failure to train theory, a City's failure to train must reflect a deliberate or conscious choice by policymaking officials, such that one could call it the City's custom or practice.   The failure to train must "amount[ ] to deliberate indifference to the [constitutional] rights of persons with whom the police come in contact." *Grazier v. City of Philadelphia,* 328 F.3d 120, 124-125 (3d Cir. 2003)(*quoting City of Canton,* 489 U.S. at 388, 109 S.Ct. at 1204 (1978)).

"The scope of failure to train liability is a narrow one." *Grazier*, 328 F.3d at 125 (3d Cir. 2003).

> "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.  That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. [citations omitted]  It may be, for example, that an otherwise sound program has occasionally been negligently administered.  Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the injury-causing conduct.  Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.  And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable."

*City of Canton v. Harris*, 489 U.S. at 391-92, 109 S.Ct. at 1206 (1978).

Inadequate training can be shown where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Id.* at 390 (1978).

Viewed in the light most favorable to Plaintiff, the following evidence related to training was presented.  Chief DeBlasis testified he told Timoney when he took office that "nobody had received enough training in the area of Uniform Crime Reporting," which had led to incorrect coding of cases.  At the time, there was only one hour of training on coding.  *N.T. 5/4/06* at pp. 55-56, 81.  When DeBlasis brought this training problem to Timoney, Timoney increased the training on coding from one hour to eight hours.  *Id.* at pp. 80-81.

At the December 6, 1999 hearing before City Council, Timoney testified that he had instituted a whole series of training regimens for the Special Victims Unit.  He had brought in private trainers from outside the Police Department (Reed Associates) to train more than forty investigators in interviewing techniques, and to provide crime scene training for "all of our folks." New recruits at the Police Academy now received four hours of training by the Special Victims Unit.  *Id.* at pp. 106-108.

When asked about training and how to change the culture, Timoney testified that a case management system to limit police officer discretion was necessary "whenever possible."  "And then our police officers don't have a right to make a call or to believe or not believe a complainant."  *Id.* at p. 125.

Referring to a comment by two police officers who were quoted in the Inquirer as stating that they didn't believe a rape victim because "usually people don't delay in reporting rape. Usually people don't bathe when reporting a rape," Timoney called the comments "really troubling" and said "it's just so wrong that it, you know, demands looking into."  Timoney noted that the two officers have been "personally trained by Inspector Tiano."  *Id.* at p. 126.

Timoney continued:

"But more importantly, we've got to look at the training at the academy that we're not allowing – if you still have these beliefs, if you are that stupid – but, you can't act out on those wrong beliefs.  And, so what you do is put systems in place.  You tell them, listen – you put down whatever the person says, and then make sure the systems are in place by the detectives that forces them to conduct an investigation.  It may turn out to be that that way have – but, at least have the detectives do an investigation.  The whole idea of a case management system was supervisor's oversight.
Let me have a final say on the thing, on the unfounded.  A detective now cannot unfound a case.  It's got supervisor review, which is [ . . . ] two supervisors must approve before a case is unfounded.  So, as much as possible, we're putting into place a system."

*Id.*

When asked about the facilities and treatment of sexual assault victims, Timoney testified that he was meeting with the advocacy community, and "this year the effort should be made toward more improvement, but also better services."  The effort was going to go toward creating an atmosphere where people could "walk into a police station and talk to a human being and not look over some plexiglass and say, hello, can I get your attention.  That's wrong.  And, so that will be the effort afoot this year.  But, I can guarantee you that it's not going to go without resistence."  *Id.* at p. 129.

When Police Officer O'Malley was asked whether she had been "given any particular training in 1999 or 2000 about the proper investigation of sexual assault cases, that was any different before 1999," O'Malley testified that she had not.  *N.T. 5/5/06* at p. 176.

Professor Anderson testified that "sex offenses require a certain kind of intensified training, and general training in crime control and responses to victims is inadequate."  Because of societal biases, police officers need to be trained "more specifically how not to engage in

victim blaming.  How to come forward with some sympathy and empathy for the victim when she comes forward."  It was Professor Anderson's opinion that "I do think that more training was necessary."  *N.T. 5/8/06* at pp. 21-22.

The evidence presented at trial, viewed in the light most favorable to Plaintiff, is insufficient to establish municipal liability on a failure to train theory.  Professor Anderson testified about the need for specialized training for police officers in the Special Victims Unit on how to treat sexual assault victims with sympathy and empathy, and opined that more training in this area was necessary.  However, the specific training that the City should have offered was not identified, nor was it established that such training was not provided.  *See Colburn v. Upper Darby Township*, 946 F.2d 1017, 1029-30 (3d Cir. 1991)("*City of Canton* teaches that municipal liability for failure to train cannot be predicated solely on a showing that the City's employees could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury.  A §1983 plaintiff pressing a claim of this kind must identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur.").

While Police Officer O'Malley denied receiving any new training in 1999 or 2000 about the proper investigation of sexual assault cases, this fact, in and of itself, does not establish that the City's training program was inadequate.  *City of Canton v. Harris*, 489 U.S. at 391-92, 109 S.Ct. at 1206 (1978).  Commissioner Timoney testified that he had brought in a private provider to train more than forty investigators in the Special Victims Unit in interviewing techniques. There was other evidence of training being provided by Commissioner Timoney - new recruits at

the Police Academy were receiving four hours of training by the Special Victims Unit; when DeBlasis identified a deficiency in coding training, Timoney increased the training in this area from one hour to eight hours; and when two police officers expressed "wrong beliefs" in the Inquirer, they were given additional training.  Timoney testified that a case management system had been put in place to limit police officer discretion on whether to believe a complainant, by requiring the approval of two supervisors before a case was unfounded.

The record before me is critically deficient of evidence on which a jury reasonably could have based its conclusion that the City of Philadelphia's training of officers in the Special Victims Unit was so obviously inadequate that it amounted to deliberate indifference to the rights of sexual assault victims.  While Plaintiff argues that "the changes in training and supervision came too late for Plaintiff,"[8] the evidence showed that Commissioner Timoney did take affirmative steps to improve training and supervision in the Special Victims Unit.  There was no evidence that Timoney continued to adhere to a training approach that he knew or should have known had failed to prevent constitutional violations with conscious disregard for the consequences.  *See Board of Commissioners of Bryan County v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 1390 (1997)(The existence of a deficient training program that does not prevent constitutional violations may eventually put municipal decisionmakers on notice that a new program is called for.  Continued adherence to a training program which decisionmakers know or should know has failed to prevent tortious conduct by employees may establish the conscious

---

[8]        *Plaintiff's Memo in Opposition* at p. 22.

disregard for the consequences of their action - the deliberate indifference necessary to trigger

municipal liability.). The evidence presented does not meet the "high burden or proving

deliberate indifference," and was insufficient to sustain liability.  *See Carswell v. Borough of*

*Homestead*, 381 F.3d 235, 245 (3d Cir. 2004), *cert. denied,* 126 S.Ct. 236 (2005).[9]

---

[9]       Because I find that the City is entitled to judgment as a matter of law on the issues
discussed, I will not address the other claims raised in the City's post-trial motion.  However, for
the purposes of completing the record, I have considered each argument presented by the City
and find no merit in the remaining arguments.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KIMBERLY MARNELL WRIGHT    :    CIVIL ACTION
    :
      v.    :
    :
CITY OF PHILADELPHIA    :    NO. 01-6160

## O R D E R

AND NOW, this 26th day of March, 2007, upon consideration of Defendant's Motion For Judgment As A Matter Of Law Or, In The Alternative, For A New Trial Or Remittitur, Plaintiff's response, and the replies filed by both parties, it is hereby **ORDERED** that:

Defendant City of Philadelphia's Motion for Judgment as a Matter of Law [Docket Entry No. 140] is **GRANTED.**

Judgment as a matter of law is entered on behalf of Defendant City of Philadelphia.

BY THE COURT:

 S/M.  FAITH ANGELL
M. FAITH ANGELL
UNITED STATES MAGISTRATE JUDGE